CALIFORNIA SAND AND GRAVEL, INC., Hansen Basin Sand and Gravel, Inc., Illinois–California Sand and Gravel, Inc., and Recon Investments, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 280–89C.

United States Claims Court.

Nov. 14, 1990.

John L. Smaha, San Diego, Cal., for plaintiffs.

Odessa P. Jackson, with whom was Asst. Atty. Gen. Stuart M. Gerson and Director David M. Cohen, for defendant.

### ORDER

MOODY R. TIDWELL, III, Judge:

This case is before the court on defendant's motion to dismiss or in the alternative, for summary judgment. Plaintiffs opposed the motion.

### FACTS

In 1941, the Army Corps of Engineers designed and constructed Hansen Dam to control Los Angeles Basin flood waters. The Corps initially allocated a portion of the pool storage capacity for sediment deposits that subsequently proved insufficient because of heavy rains, and the residue of fire. Excavating the dam was expensive, and budgetary constraints led to an innovative program under which the Corps granted four licenses for the excavation and sale of sand and gravel from the pool for five cents a cubic yard. Each

1. Two other licenses contained the same language as in plaintiff's license. The fourth license, governing the remaining licensee, Mr. Paul Hurns, was for a set period of five years.

2. The pertinent part of the full provision reads: [A]uthority is hereby granted to the Chief of Engineers, the Deputy Chief of engineers, and the Director of Real Estate, or any of them, to approve, execute, amend, renew, revoke, and terminate in the name of and by authority of

licensee had a designated excavation area within the basin, as well as an area in which to set up a processing plant. On March 26, 1982, the Corps issued an excavation license to California Sand and Gravel, Inc. that provided in part:

> The Secretary of the Army hereby grants to California Sand and Gravel, Inc., a California Corporation ... a license for the period of one year commencing on 29 March 1982 and ending on 28 March 1983, and thereafter renewable on a year-to-year basis during an additional 4–year term, to 28 March '87, but revocable at the will of the Secretary of the Army, to remove 600,000 cubic yards of sediment annually from the Hansen Dam Basin.[1]

Conditions 12 and 30 of the license provided, respectively:

> 12. The license is to be issued for a period of one year and renewable on a year-to-year basis during the next four year [sic], subject to satisfactory performance by the licensee.
>
> 30. Unless otherwise specified herein, the license may be revoked or cancelled at any time when required for flood control purposes. The Corps of Engineers shall reserve the right to revoke th s [sic] license on 30 days notice.

Under Army regulations, contracting authority lies with the Secretary of the Army who can delegate the authority to appropriate persons. In this case, the Secretary had delegated contracting authority to the Chief of Engineers, the Deputy Chief of Engineers, and the Director of Real Estate. These officers then could re-delegate the authority in writing to other officers whom they, respectively, supervised.[2] According to the letter of delegation applicable to the

the Secretary of the Army, licenses granting the use of real property under the jurisdiction of the Army.... The authority hereby delegated may be redelegated in writing to Division Engineers with authority to redelegate to their Chiefs of Real Estate Divisions, or to their District Engineers with authority to redelegate to their Chiefs of Real Estate Divisions.

Hansen Dam project, Colonel Taylor, the District Engineer, and Mr. William Cheadle, the District Chief of Real Estate, were the only officers with contracting authority to approve, execute, amend, renew, revoke, or terminate California Sand and Gravel's license. The District Chief of Operations, Mr. Robert Land, did not have that authority.

Subsequent to execution of the lease, Mr. John H. King introduced himself to certain unidentified District or Division officers explaining that he was considering the purchase of California Sand and Gravel, and wanted to discuss certain provisions, as well as any problems that might occur with the license because of a change in ownership of the licensee. In response to Mr. King's questions, the District officers allegedly explained that Condition 30 of the license meant the Army would cancel California Sand and Gravel's license only in case of a flood or disaster. When Mr. King asked what "revocable at the will of the Secretary of the Army" meant, these same unnamed officers allegedly told him that the government would terminate pursuant to this clause only in case of war or national disaster. Plaintiff also alleged that he was assured yearly reapplication for the license was unnecessary as the Army would renew it automatically each year for the five-year term, so long as plaintiff's work was satisfactory. Plaintiff maintained that these verbal assurances constituted binding agreements.

Mr. King eventually purchased plaintiff California Sand and Gravel. Its relationships with the other three plaintiffs arose through a convoluted series of transactions. Originally, California Sand and Gravel was a wholly owned subsidiary of Recon Investments, Inc. (Recon). Mr. King then formed Illinois–California Sand and Gravel, Inc. (Illinois–California) which obtained a controlling interest in Recon and purchased all of Recon's California Sand and Gravel stock. The result was that

Illinois–California now controlled both California Sand and Gravel and Recon. In order to attract additional capital, Mr. King formed a general partnership known as Hansen Basin Sand and Gravel (Hansen Basin) to control Illinois–California. Mr. King did not insist on renegotiating the license to include Illinois–California, Recon, or Hansen Basin; neither was the license assigned.

At some point, California Sand and Gravel encountered start-up problems with its plant. Therefore, the parties amended the license to establish the run of the first term from March 28, 1982, to July 29, 1983. By July 29, 1983, plaintiff had not received any notice of renewal, but continued to operate with no objection from defendant.

Sometime in early 1982, discord developed between the Corps and Paul Hurns who allegedly had removed sediment and silt from outside his license area. California Sand and Gravel also experienced problems with Hurns, and eventually instituted legal action against him.

In late 1983, the Corps informed Mr. King that it intended to select a single, exclusive licensee to operate at Hansen Dam Basin because the four current licensees had not removed enough sediment and silt, thereby creating possible flood conditions. In early March of 1984, Mr. Land, the District Chief of Operations, informed Mr. King that Channel and Basin Reclamation, Inc. (Channel) likely would be the new licensee.[3] Mr. Land allegedly encouraged Mr. King to subcontract to Channel. Mr. Land also allegedly told Mr. King that, if California Sand and Gravel would relinquish its claims under the Hansen Dam license, defendant would grant plaintiff a new license to excavate material at the Santa Fe Dam. Mr. King alleged that shortly thereafter he met with the District Engineer and the District Chief of Real Estate, who both told him that anything he

---

**3.** The Corps issued a Request for Proposals seeking a single licensee to excavate sediment and silt from the Hansen Dam pool. The license was for five years. All interested parties, including plaintiffs, had an opportunity to compete for the license. The record does not show whether plaintiffs participated in the competition, but that fact is not relevant to our findings today.

worked out with Mr. Land would be fine with them.

On April 9, 1984, the Corps executed an exclusive five-year license with Channel to operate at Hansen Dam. One day later, on April 10, 1984, defendant terminated plaintiff's license based on paragraph two of what has been described as Amendment Five to the license, to wit: "this license may be terminated at any time by the Government by giving a 30–day advance written notice to the licensee." Paragraph one of Amendment Five, which the court will address later in this opinion, stated "[t]hat the term of the license is extended on a month to month basis beginning on 1 August 1983, subject to the same conditions as contained in same (sic) license as amended." However, amendment five never was executed and was thus, a nullity. Shortly thereafter, plaintiff approached Channel with an offer to subcontract. Channel declined.

On May 9, 1984, Mr. King sent two letters to the District Chief of Operations. The first confirmed that plaintiff would vacate the Hansen Dam premises. The second requested that the Corps grant plaintiff a license to remove sediment and silt at the Santa Fe Dam project. Soon after sending the letters, plaintiff sent defendant a proposal for operation under a license at the Santa Fe Dam project as he allegedly had discussed with Mr. Land. In late June, defendant denied plaintiff's transfer to the Santa Fe Dam project stating that the Army would award those licenses competitively according to Corps regulations.

On May 15, 1989, California Sand and Gravel, Illinois–California, Recon, and Hansen Basin filed a complaint in this court claiming damages for breach of contract on the Hansen Dam license, breach of oral contract on the "agreement" that the license automatically was renewable for four years, breach of the implied covenant of good faith and fair dealing premised on defendant's grant of the exclusive Hansen Dam license to Channel, and wrongful termination of plaintiff's license agreement for the sole reason of removing all the contractors at the dam in order to oust Paul Hurns.

## DISCUSSION

Pursuant to RUSCC 12(b)(1) and (4), defendant moved for dismissal for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. In the alternative, defendant moved for summary judgment. Because matters outside the pleadings were included in the motion papers, the court will consider the motion as one for summary judgment. *See William F. Reade v. United States*, 14 Cl.Ct. 531, 532 (1988). Summary judgment is appropriate only when there are no material issues of fact so that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987); *Hendricks v. United States*, 10 Cl.Ct. 703, 706 (1986). For purposes of this motion, the court will view all evidence and inferences in the light most favorable to plaintiff. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1146 (Fed.Cir.1983).

## I. JURISDICTION

This court's jurisdiction is defined by the Tucker Act, 28 U.S.C. § 1491 (1988). The Tucker Act alone does not create a substantive right to recover money, but instead waives sovereign immunity under specific conditions. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). In order for this court to exercise jurisdiction over plaintiffs' claims, the claims must be predicated on a constitutional provision, statute, executive department regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (1988). Plaintiffs satisfied this requirement by seeking recovery under its license to remove sediment and silt from the Hansen Dam Basin. However, for jurisdictional purposes, privity of contract also is a neces-

**24**

sary prerequisite to maintaining a suit against the government in the Claims Court. *See, e.g., Thomas Funding Corp. v. United States,* 15 Cl.Ct. 495, 499 (1988).

■ Defendant moved to dismiss portions of the complaint because there was no privity of contract between defendant and three of the plaintiffs: Illinois–California, Recon, and Hansen Basin. Absent privity, a party lacks standing to sue; without standing, the court is without jurisdiction to resolve issues raised by that party. Plaintiffs insisted that privity arose under California Sand and Gravel's obligation to disburse to the three other plaintiffs part of California Sand and Gravel's income from the license. Plaintiffs also argued that the privity issue is premature because it properly will arise only in the damages phase of this case. The court believes that the interests of all parties are better served by addressing jurisdiction at the outset of these proceedings.[4]

■ Plaintiffs asserted that California Sand and Gravel, Hansen Basin, Recon, and Illinois–California all are "real part[ies] in interest" within the confines of RUSCC 17(a). A "real party in interest" is the party that "possesses the substantive right under which suit is brought." *Wall Indus., Inc. v. United States,* 15 Cl.Ct. 796, 803 (1988), *aff'd,* 883 F.2d 1027 (Fed.Cir. 1989). Citing *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.,* 620 F.2d 1 (1st Cir.1980), plaintiffs Hansen Basin, Recon, and Illinois–California argued that their various relationships with California Sand and Gravel are sufficient to give all four plaintiffs the substantive right to bring suit because all benefitted from the operation at Hansen Dam. The court, however, believes that plaintiffs' reliance on *Prevor* is misplaced. In *Prevor,* plaintiff Prevor–Mayorsohn Caribbean, was a subsidiary of Prevor–Mayorsohn International (International). International owned produce that was shipped and damaged on defendant's vessel. Plaintiff, named as cosignee in the bills of lad-

ing, sued for damages. On appeal, the United States Court of Appeals for the First Circuit held that even though International was the owner of the goods, its subsidiary consignee had sufficient interest to sue. *Id.* at 4. Unlike *Prevor,* in the case at hand the relationships amongst the four plaintiffs did not exist at the time California Sand and Gravel entered into the license agreement with defendant. Moreover, *Prevor* addressed the rights of parties as specifically spelled out in the Uniform Commercial Code for negotiable bills of lading, not the rights of parties vis-a-vis a government contract.

Plaintiffs also argued that RUSCC 19, as applied in *Bonar, Inc. v. Schottland,* 631 F.Supp. 990 (E.D.Pa.1986), compels the joinder of Illinois–California, Recon, and Hansen Basin. *Bonar* required joinder of a corporate parent that had an interest identical to that of its subsidiary. 631 F.Supp. at 999. Though *Bonar* is insightful, it is not binding on this court. Moreover, this court does not interpret RUSCC 19 to compel joinder in this case, primarily because waivers of sovereign immunity are to be construed strictly. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969); *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1557 (Fed.Cir.1983).

■ Plaintiffs asserted that jurisdiction over Illinois–California, Hansen Basin, and Recon would be proper pursuant to section 10 of the Contracts Dispute Act, 41 U.S.C. §§ 601–613 (1987), which provides for judicial review of an adverse decision by the contracting officer. The court cannot agree. Claims Court jurisdiction under the CDA is proper only after submission of a certified claim to the contracting officer, and the contracting officer's issuance of a final decision on the claim. *Paragon Energy Corp. v. United States,* 645 F.2d 966, 967, 227 Ct.Cl. 176 (Ct.Cl.1981); *Overall Roofing & Constr., Inc. v. United States,*

---

**4.** This court is obligated to address its jurisdiction, even *sua sponte. Arctic Corner, Inc. v.*

*United States,* 845 F.2d 999, 1000 (Fed.Cir.1988).

20 Cl.Ct. 181, 183 (1990); 41 U.S.C. § 605 (1987). Plaintiffs have not completed these requisite steps and, therefore, cannot invoke jurisdiction pursuant to the Contract Disputes Act.

For the reasons stated above, the court is of the opinion that California Sand and Gravel is the only plaintiff that may maintain an action against the government based upon the license. The court therefore dismisses for want of jurisdiction (*i.e.,* lack of privity) those portions of the complaint which relate to Recon, Hansen Basin, and Illinois–California. This is not to say, however, that the other companies may not have a legal remedy against the sole remaining plaintiff.

## II. EXTRINSIC EVIDENCE

Plaintiff California Sand and Gravel asserted that defendant orally agreed to three matters outside the written contract: that (1) California Sand and Gravel could move to Santa Fe Dam in consideration for a release of claims against defendant for early termination at Hansen Dam Basin; (2) that plaintiff's license was renewable automatically for a period of four more years; and (3) termination "at the will of the Secretary of the Army" meant defendant would cancel the license only in times of flood, war, or national emergency. In it's motion to dismiss, defendant argued that the parol evidence rule precludes the court from considering extrinsic evidence that would vary the clear meaning of the license.

 The parol evidence rule is not a rule of evidence, but a rule of substantive law that prevents the use of extrinsic evidence to add to or modify the terms of an integrated contract, *i.e.,* a writing the parties have adopted as an expression of their final agreement. *E.g., David Nassif Assocs. v. United States,* 557 F.2d 249, 256, 214 Ct.Cl. 407 (1977). The rule prohibits parties from varying integrated agreements by introducing evidence of inconsistent prior or contemporaneous terms. *Montana Power Co. v. United States,* 8 Cl.Ct. 730, 735 (1985); *De Barros v. United States,* 5 Cl.Ct. 391, 395 (1984). Therefore,

critical to the resolution of any parol evidence problem is the question of integration. *Montana Power,* 8 Cl.Ct. at 735; *Restatement (Second) of Contracts* § 209 (1979).

 Plaintiff, citing *Campbell v. United States,* 661 F.2d 209, 218, 228 Ct.Cl. 661 (1981), argued that the license was not integrated completely because it lacked an integration clause. This court is unable to read *Campbell* as supportive of plaintiff's position. The disputed writing in *Campbell* stated that the contract contained the entire understanding of the parties. *Campbell* concluded that given the agreement's "specificity . . . and its disavowal of any undertakings save those specifically enumerated—it [was] a fair bet that the parties agreed to no more than they said." 661 F.2d at 218. *Campbell* did not hold that an integration clause is requisite to a finding of integration; it merely upheld the plain language of the contract. Neither an integration clause nor the writing itself is conclusive in determining integration because "the writing cannot prove its own integration". *Sylvania Elec. Prods., Inc. v. United States,* 458 F.2d 994, 1006, 198 Ct.Cl. 106 (1972). A document is integrated if the court finds that the parties to the agreement intended it to be the final, complete, and exclusive manifestation of the terms of their agreement. *Nassif,* 557 F.2d at 256.

 Plaintiff attempted to establish that the parties did not intend the license agreement to be final and exclusive by showing that it later was modified by at least four written amendments. This court, however, has never held that legitimate subsequent modifications indicate a written license was not final and completely integrated. Only actions and negotiations prior to, or contemporaneous with, the execution of the license would have any relevance. *See Northbridge Elecs. v. United States,* 175 Ct.Cl. 426, 438 n. 8 (1966); J. Cibinic & R. Nash, *Administration of Government Contracts* 131–36 (1985). Parties often reasonably cannot anticipate every possible need at the time they make an agreement. The mere fact that the

parties modified the contract to accommodate changed circumstances does not, in and of itself, indicate they did not intend the agreement to be final when signed.

■ Absent evidence establishing that the writing, in fact, did not constitute a final expression, the general rule for determining integration is that where the terms on the whole are complete and specific, the written contract "is presumed, in law, to express the final understanding of the parties." *Brawley v. United States*, 96 U.S. 168, 173–74, 24 L.Ed. 622 (1878); *Merando, Inc. v. United States*, 475 F.2d 603, 605, 201 Ct.Cl. 28 (1973); *Peterson–Sharpe Eng'g Corp. v. United States*, 6 Cl.Ct. 288, 296 (1984). That is the case here. The existence of a specific, executed, written contract compels the court to conclude that the parties intended the license to be integrated completely, and parol evidence may not vary its terms. *Peterson–Sharpe*, 6 Cl.Ct. at 296; *Sea–Land, Serv., Inc. v. United States*, 553 F.2d 651, 656, 213 Ct.Cl. 555 (1977) *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). As the Supreme Court stated in *Brawley*, "[t]he written contract merged all previous negotiations, and is presumed, in law, to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimants folly to have signed it." 96 U.S. at 173.

*A. The Santa Fe Dam Agreement*

■ Consideration of subsequent modifications is not barred by the parol evidence rule. The court may consider the merit of the subsequent statements themselves to determine whether they constitute valid modifications to the underlying contract. *Montana Power Co.*, 8 Cl.Ct. at 736.

■ Plaintiff claimed that defendant, through Mr. Land, verbally agreed that plaintiff could move to Santa Fe Dam in consideration for defendant's early termination of the Hansen Dam Basin License, and the waiver of any claims that might arise from the early termination. Defendant argued that Mr. Land's alleged statements did not modify or create a new contract because those statements were beyond the scope of Mr. Land's authority to bind defendant.

To recover under a contract with the United States, plaintiff must show that the "officer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *OAO Corp. v. United States*, 17 Cl.Ct. 91, 99 (1989). Persons who contract with the government take upon themselves the "risk of having accurately ascertained that he who purports to act for the [G]overnment stays within the bounds of his authority." *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 383, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Plaintiff claimed that the District Engineer and the District Chief of Real Estate, both of whom possessed the requisite contracting authority, told Mr. King to "work something out with Land." [5] Plaintiff's contentions are without merit because any alleged delegation of authority to District Chief of Operations Land, who was not an authorized delegatee, necessarily would have been ineffective. It may not be equitable, but it is the law, and it is the duty of this court to apply the law the way it was written by the Congress and interpreted by the United States Court of Appeals for the Federal Circuit, and the Supreme Court. This court virtually has no "equitable" authority, and what does exist is inapplicable to the facts of this case.

Plaintiff also asserted that the District Engineer and the District Chief of Real Estate granted Mr. Land implied actual authority. Plaintiff based its argument on *H. Landau & Co. v. United States*, 16 Cl.Ct. 35 (1988), *vacated on other grounds*, 886 F.2d 322 (Fed.Cir.1989). In *Landau*, a supplier to a government contractor brought an action claiming that the government had guaranteed payment, but thereafter failed to pay for materials the supplier delivered to the government contractor.

---

**5.** Defendant denies that it ever told Mr. Land to reach an agreement with Mr. King.

The Claims Court held that the supplier could not recover from the government because the agent who guaranteed payment lacked authority to bind the government. *Landau*, 16 Cl.Ct. at 38.

On appeal, the Federal Circuit raised the issue of implied actual authority which, if found, would bind the government. *Landau*, 886 F.2d at 324. According to the Federal Circuit, actual authority may be implied when such authority is an "integral part of the duties assigned to a government employee." 886 F.2d at 324 (*quoting* J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982)). In *Landau*, the agent of the government who made the guaranty was not a contracting officer, but did possess actual authority to draw checks on a joint bank account. The court held that such express authority might carry with it the implied authority to guarantee payment from that account. *Landau*, 886 F.2d at 324. The Federal Circuit remanded *Landau* to the Claims Court for a finding of whether the agent did possess implied actual authority. The Claims Court found that he did not. "It was not [the agent's] responsibility to assure that the contract was performed" and he did not have "day-to-day responsibility regarding performance of the contract." *H. Landau & Co. v. United States*, 20 Cl.Ct. 400, 406 (1990).

▮ The court is of the opinion that, in some circumstances, a person with some limited actual authority impliedly may have broader authority. However, a person with no actual authority may not gain actual authority through the court-made rule of implied actual authority. Specifically, the court may not substitute itself unconditionally for the executive in granting authority to an unauthorized person. The most the court can do is interpret the limited authority of an authorized person in a broader manner than ordinarily would be the case. As a predicate to a finding of implied actual authority, there must be, at the least, some limited, related authority upon which the court can "administer" the law so as not to ignore the policies and decisions of those persons charged with managing government programs. The court believes that *Landau* and the theory of implied actual authority is of limited application, and was not intended to repeal the long established rule that, when dealing with the government, only government agents with actual authority can make a contract, express or implied. *E.g., Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed.Cir.1987); *S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 4 (Fed.Cir.1985); *ATL, Inc. v. United States*, 735 F.2d 1343, 1345 (Fed.Cir.1984); *Lehner v. United States*, 1 Cl.Ct. 408, 415 (1983); *Emeco Indus. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973); *Housing Corp. of Am. v. United States*, 468 F.2d 922, 925, 199 Ct.Cl. 705 (1972).

Additionally, modifying a contract in no way can be considered an integral part of the duty of reviewing contractor compliance. Under no circumstances did Mr. Land have authority to assure Mr. King that he would receive a license at Santa Fe Dam. None of Mr. Lands' duties, as described, put him in any position to bind the government to a contract, even impliedly. Therefore, any statements of modification to the license allegedly made by District Chief of Operations, Robert Land, were without consequence for defendant. If the District Chief of Engineers and the District Chief of Real Estate did, in fact, tell Mr. King to "work out an arrangement with Mr. Land," they acted improperly and beyond the scope of their authority. It is axiomatic that an agent of the government not possessing contracting officer authority cannot be granted that authority, expressly or impliedly, by other agents who have no authority to make the grant.

▮ Finally, plaintiff argued that even if Mr. Land had no authority, the District Engineer and the District Chief of Real Estate ratified the unauthorized acts by not objecting to the proposal of moving plaintiff to the Santa Fe Dam project, and by telling plaintiff to "work something out" with Mr. Land. For effective ratification, a superior must have authority to ratify, knowledge of a subordinate's unauthorized act, and then must confirm, adopt,

or acquiesce to the unauthorized action of his subordinate. *See United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 375, 45 L.Ed. 563 (1901). Where a plaintiff claims the government ratified the act of an agent who acted without authority, "such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken." *Id.*

The court finds that plaintiff's ratification argument is weak, at best, based as it is on one vague statement and a failure to object, with no showing that either the District Engineer or the District Chief of Real Estate was sufficiently aware of material facts at the time to object, or, for that matter, did acquiesce to Mr. Land's purported statement about the move to the Santa Fe dam. The discussion between Mr. King and the government about the Santa Fe Dam was nothing more than just that, a discussion. As such, it cannot bind the government.

### B. Automatic Renewal of the Hansen Dam License

██ Plaintiff alleged that before signing the license, defendant, through and unidentified officer, assured California Sand and Gravel that the government would renew the Hansen Dam Basin license automatically for at least four years. Defendant responded that even if the assurance had been made, it cannot vary the clear meaning of the integrated agreement. The court cannot find in favor of plaintiff upon the basis of such vague allegations even viewing plaintiff's position in the most favorable light. Defendant must prevail because of the parol evidence rule. *Montana Power*, 8 Cl.Ct. at 735. Even had defendant made these alleged assurances after issuing the Hansen Dam license, plaintiff has failed to identify as the speaker any government officer duly appointed with the authority to make such assurances. *See Marks v. United States*, 15 Cl.Ct. 609, 614 (1988). These assurances, therefore, are not binding on the government regardless of when made, and this court finds that the Hansen Dam license agreement was not modified verbally to make the license renewable automatically for four additional years, notwithstanding the fact that it was renewed automatically for at least one year. Moreover, even were the assurances valid, defendant, at no time, relinquished its right to terminate the lease under the lease terms.

### C. Termination Clause Modifications

██ The Hansen Dam License contained two separate clauses dealing with the government's right to terminate. Generally, the government could cancel "at the will of the Secretary of the Army." Specifically, Condition 30 permitted defendant to (1) revoke the license for flood control purposes, or (2) terminate the license upon 30-days notice. Plaintiff alleged that it had an agreement with defendant defining the meaning of both clauses. Plaintiff further alleged that this "agreement" arose after the parties executed the license and therefore is not barred by the parol evidence rule.

Mr. King stated that when he asked about the meaning of Condition 30, "various Army Corps officials" explained that it would operate only in the event of a flood or disaster, and that once the flood or disaster subsided, plaintiff could return to the dam.[6] Mr. King further alleged that these same officials told him the "at the will of the Secretary of the Army" termination clause actually meant the government would cancel the license "at will" only if the government needed the property in times of war. However, plaintiff again has failed to identify any Corps official with contracting authority who made these representations. For that reason, to the extent the responses to plaintiff's inquiries can be classified as agreements or modifications, they must fail.

---

6. The logic of this statement escapes the court. If the licensee was to leave the sediment removal area only for the duration of a flood, it would be senseless to terminate the license for that purpose. In fact, Condition 31 of the license directed the licensee to cease operation during the high-risk flood period each year. The Army logically would not terminate the license only to re-grant it once the flood waters had receded.

We know Condition 30 specifies that "the license may be revoked or cancelled at any time when required for flood control purposes, [and] [t]he Corps of Engineers shall reserve the right to revoke th s [sic] license on 30 days notice." Plaintiff insists Condition 30 gives the Corps the right to terminate the contract on 30 days notice only when required for flood control purposes. The court does not believe that to be an accurate interpretation of Condition 30. The interpretation of a government contract is a matter of law, not fact, *Hol–Gar Mfg. Corp. v. United States*, 351 F.2d 972, 974, 169 Ct.Cl. 384 (1965), and the court is bound to interpret a contract by the plain, reasonable meaning of the language used, *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551, 195 Ct.Cl. 21 (1971), so as to give meaning to all parts of the contract and not render a portion meaningless, *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed. Cir.1985). A court interpreting a contract also must "examine the reasonableness of the business transaction in order to determine which of several [potentially] competing interpretations is most reasonable and likely under the total circumstances including the business realities of the case." *Consumers Ice Co. v. United States*, 475 F.2d 1161, 1167, 201 Ct.Cl. 116 (1973).

Plaintiff would have the court find that under Condition 30, the Corps must give thirty-days notice of termination in the event of flooding. The court cannot agree with plaintiff's argument; it assumes too much. As a matter of law, the court interprets the two sentences of Condition 30 as separate in application. The Corps could revoke the license either (1) when required for flood control purposes, or (2) upon thirty-days notice with no flood control condition precedent. Neither of the two sentences, in all reasonableness, can be read as a condition to the other. It would be illogical to require the Corps to give a licensee thirty-days notice of a revocation or cancellation of its license for flood con-trol purposes. Time would not permit the Corps to give thirty days to remove a licensee from the Hansen Dam site in the face of a flood. Condition 30 must be read in the disjunctive, *i.e.*, the Corps could revoke a license with no advance notice in order to control flood waters, or it could revoke a license for other reasons simply upon thirty-days notice. The Corps chose the latter.

## III. TERMINATION OF THE LICENSE AGREEMENT

Defendant asserted that Amendment Five was a valid modification of the license agreement, but the court already has found that Amendment Five was a nullity.[7] It does not follow, however, that the termination was ineffective. Condition 30 of the lease reserved to defendant the right to revoke the lease on thirty-days notice. Although the court has no doubt but that the licenses were poorly conceived and administered, that fact cannot deny defendant its rights under the licenses, especially a right as crucial to any government contract as the right to revoke the licenses for reasonable cause. Here, the cause was reasonable; plaintiff and other licensees failed to perform adequately. On that, the record is clear. Had the licensees removed the sediment sufficiently so as not to not create a flood hazard the government, in all likelihood, would have permitted each, including California Sand & Gravel, Inc., to complete its five-year term.

Admittedly, it is unusual for defendant to terminate a contract without citing a term or condition of the contract, much less the proper term or condition, but that error is not fatal to defendant's case. Whenever the United States casts off its cloak of sovereign immunity to engage in a business-type activity with a business-minded purpose, it must be treated as a private commercial contractor. *Standard Oil Co. v. United States*, 267 U.S. 76, 79, 45 S.Ct. 211, 212, 69 L.Ed. 519 (1925). Therefore, the court must view defendant's actions as

7. The court also notes, based on the evidence presented, that Amendment Five would have been ineffective for lack of consideration. *Brennan v. United States*, 7 Cl.Ct. 399, 405 (1985). Defendant legally could not have bound plaintiff to an agreement under which it relinquished a remaining lease year while receiving nothing in return.

if the government were a private enterprise, with exceptions not pertinent here. A court interpreting a contract also must examine the reasonableness of the business transaction in order to determine the business realities of the case. *Consumers Ice Co. v. United States*, 475 F.2d at 1167. The government contracts as does a private person, and its rights and duties are governed by the law applicable to contracts between private individuals. *Torncello v. United States*, 681 F.2d 756, 762, 231 Ct.Cl. 20 (1982). Government contracts are given the meaning imputed to a "reasonably intelligent contractor" acquainted with the involved circumstances. *Zinger Constr. Co. v. United States*, 807 F.2d 979, 981 (Fed.Cir.1986). Just as a contract is to be interpreted with the standards just stated, so are defendant's actions to be tested. Condition 30 reserved to defendant the right to terminate or revoke (the terms are synonymous here) the license upon thirty-days notice. Defendant complied substantially, legally, and within the spirit of Condition 30 in terminating plaintiff's license, even though defendant cited an inapplicable clause as the vehicle for the termination. The termination was as effective as it would have been in the private sector, and equally effective as if no clause were cited. The court must look to the substance of the action, not the phrasing.

## CONCLUSION

After a careful review of the facts and the applicable law, the court grants defendant's motion for summary judgment. The court grants defendant's motion to dismiss for lack of jurisdiction against plaintiffs Illinois–California, Recon, and Hansen Basin. Considering all evidence and inferences in favor of California Sand and Gravel, the court finds that the statements made by District Chief of Operations, Robert Land, did not modify the contract because the court cannot find that he had the requisite authority to obligate defendant. Nor were his actions ratified. Plaintiff's claims for breach of written contract, breach of oral contract, and breach of the implied covenant of good faith and fair dealing are foreclosed. The complaint is dismissed.

The Clerk of the court is directed to enter judgment in favor of the defendant.

IT IS SO ORDERED.

